UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRANDON MARTIN WILLETTE,          Case No. 14-11637

          Plaintiff,          Terrence G. Berg
v.          United States District Judge

COMMISSIONER OF SOCIAL SECURITY,          Michael Hluchaniuk
United States Magistrate Judge

          Defendant.
_____/

**REPORT AND RECOMMENDATION**
**CROSS MOTIONS FOR SUMMARY JUDGMENT (Dkt. 12, 13)**

## I.     PROCEDURAL HISTORY

    A.     Proceedings in this Court

On April 24, 2014, plaintiff filed the instant suit seeking judicial review of

the Commissioner's unfavorable decision disallowing benefits.  (Dkt. 1).  Pursuant

to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(b)(3), District Judge Terrence G.

Berg referred this matter to the undersigned for the purpose of reviewing the

Commissioner's decision denying plaintiff's claims for period of disability,

disability insurance benefits and supplemental security income.  (Dkt. 3).  This

matter is before the Court on cross-motions for summary judgment.  (Dkt. 14, 16).

    A.     Administrative Proceedings

Plaintiff filed the instant claims on July 5, 2011, alleging that he was

disabled on May 17, 2011.  (Dkt. 7-2, Pg ID 53).  The claims were initially

disapproved by the Commissioner on January 6, 2012.  *Id*.  Plaintiff requested a

hearing and on November 28, 2012, plaintiff appeared with counsel before

Administrative Law Judge (ALJ), JoErin O'Leary who considered the case *de

novo*.  (Dkt. 7-2, Pg ID 68-89).  In a decision dated January 9, 2013, the ALJ

found that plaintiff was not disabled.  (Dkt. 7-2, Pg ID 50-61).  Plaintiff requested

a review of that decision, and the ALJ's decision became the final decision of the

Commissioner when, after review of additional exhibits, the Appeals Council, on

February 25, 2014, denied plaintiff's request for review.  (Dkt. 7-2, Pg ID 39-44);

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004).[1]

For the reasons set forth below, the undersigned **RECOMMENDS** that

plaintiff's motion for summary judgment be **GRANTED** in part and **DENIED** in

part, that defendant's motion for summary judgment be **GRANTED** in part and

**DENIED** in part, that the findings of the Commissioner be **AFFIRMED** in part

and **REVERSED** in part, and that this matter be **REMANDED** for further

---

[1]  In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

proceedings under Sentence Four.

## II.    FACTUAL BACKGROUND

### A.    ALJ Findings

Plaintiff was 25 years old on the application date.  (Dkt. 7-6, Pg ID 215).

Plaintiff's relevant work history included work as a stock clerk.  (Dkt. 7-2, Pg ID

60).  The ALJ applied the five-step disability analysis to plaintiff's claims and

found at step one that plaintiff had not engaged in substantial gainful activity since

the alleged onset date.  (Dkt. 7-2, Pg ID 55).  At step two, the ALJ found that

plaintiff's epilepsy and borderline intellectual function were "severe" within the

meaning of the second sequential step.  *Id.*  At step three, the ALJ found that

plaintiff did not have an impairment or combination of impairments that meets or

medically equals the severity of one of the listed impairments.  (Dkt. 7-2, Pg ID

55-56). The ALJ found that plaintiff has the following RFC:

> After careful consideration of the entire record, I find
> that the claimant has the residual functional capacity to
> perform a full range of work at all exertional levels but
> with the following nonexertional limitations: He can
> never climb ladders, ropes, or scaffolds. He must avoid
> unprotected heights and moving mechanical parts. The
> claimant cannot operate a motor vehicle commercially.
> He is limited to simple routine tasks performed in a low
> stress work environment (defined as simple work-related
> decisions).

(Dkt. 7-2, Pg ID 47).  At step four, the ALJ concluded that plaintiff could perform

his past relevant work as a stock clerk.  (Dkt. 7-2, Pg ID 60).  Thus, the ALJ

concluded that plaintiff had not been under a disability from the alleged onset date

through the date of decision.  (Dkt. 7-2, Pg ID 61).

B.      Plaintiff's Claims of Error

According to plaintiff, the ALJ failed to provide sufficient analysis as to

whether his epilepsy disorder and resulting seizures satisfied the criteria of Listing

11.02.  Plaintiff contends that this was legal error because the evidence of record

from Dr. Buday, plaintiff's long-time treating Board-certified neurologist, was

consistent with a finding that plaintiff's seizure disorder satisfied the requirements

of Listing 11.02.

To meet the criteria for Listing 11.02 epilepsy-convulsive epilepsy (grand

mal or psychomotor), the claimant must present a documented detailed description

of a typical seizure pattern, including all associated phenomena, showing that his

seizures occur more frequently than once a month in spite of at least 3 months of

prescribed treatment.  The claimant's seizure pattern must demonstrate either (A)

daytime episodes with loss of consciousness and convulsive seizures, or (B)

nighttime episodes manifesting residuals which interfere significantly with

daytime activity.  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.02.  It is axiomatic that

an ALJ must provide specific analysis as to why a claimant does or does not meet

or equal a listing at step three.  *See Burnett v. Comm'r of Soc. Sec. Admin.*, 220

4

F.3d 112, 119 (3d Cir. 2000) (holding that an ALJ must provide an explicit analysis as to what listings were considered and why they were not satisfied in order to permit "meaningful judicial review.").

Plaintiff points out that the ALJ's analysis in this case as to whether his seizure disorder satisfied the requirements of Listing 11.02 consists of just one sentence in one paragraph. (Tr. 18). In comparison, the analysis as to whether his impairments satisfied the requirements of Listing 12.05 for mental retardation which he never asserted, consisted of 13 paragraphs. (Tr. 18-19). With regard to Listing 11.02, the ALJ found that the record failed to demonstrate a documented typical seizure pattern occurring more frequently than once a month. The ALJ's basis for this conclusion is then set forth solely in this one sentence: "The claimant's treating physician noted the claimant's report of no recurrence of seizures at the time of the claimant's alleged onset date and of possible medication noncompliance since. (3F, 5F)." (Tr. 18). Based on this meager and incorrect analysis, plaintiff says the ALJ incorrectly concluded that his seizure disorder does not reach listing level severity. (Tr. 18). At the end of her step 3 finding section of her decision, the ALJ stated – erroneously, according to plaintiff – that: "no acceptable medical source had mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination." (Tr. 19). According to plaintiff, this statement completely ignored Dr. Buday's finding that

plaintiff's seizure disorder was of listing level severity. Plaintiff further contends that the ALJ's analysis fails to take into consideration all of Dr. Buday's findings and opinions regarding the severity of plaintiff's seizure disorder and is based on two isolated statements from all of Dr. Buday's decade-plus long treatment of plaintiff. The ALJ failed to consider at all Dr. Buday's June 15, 2012 conclusion that plaintiff was experiencing seizures of a frequency of more than once a month in spite of following prescribed treatment and that his seizure condition met the definition and criteria of Listing 11.02. (Tr. 298). Plaintiff also points out that there is no medical source opinion of record which contradicts Dr. Buday's opinion on this issue. For this reason alone, plaintiff maintains that the ALJ's step 3 finding cannot be sustained as it is indefensible.

According to plaintiff, the fact that Dr. Buday conceded that plaintiff's condition did not meet Listing 11.03 proves that the questionnaire that Dr. Buday completed was well thought out and documented by years of treatment history. While it is true that Dr. Buday noted in his treatment record of May 2, 2011, that plaintiff had no recurrence of seizures (Tr. 282, 292), the ALJ failed to reconcile this statement with all the other reports from Dr. Buday that do indicate that plaintiff was still experiencing seizures despite complying with prescribed treatment. (Tr. 282-97). Furthermore, the ALJ failed to consider the fact that all blood level tests of record show that his medication levels were always within

6

therapeutic range.  (Tr. 285-89, 293, 297).  The Commissioner's regulations

require that:

> Under 11.02 and 11.03, the criteria can be applied only if
> the impairment persists despite the fact that the
> individual is following prescribed antiepileptic
> treatment. Adherence to prescribed antiepileptic therapy
> can ordinarily be determined from objective clinical
> findings in the report of the physician currently
> providing treatment for epilepsy. Determination of blood
> levels of phenytoin sodium or other antiepileptic drugs
> may serve to indicate whether the prescribed medication
> is being taken. When seizures are occurring at the
> frequency stated in 11.02 or 11.03, evaluation of the
> severity of the impairment must include consideration of
> the serum drug levels.

> Should serum drug levels appear therapeutically
> inadequate, consideration should be given as to whether
> this is caused by individual idiosyncrasy in absorption or
> metabolism of the drug. Blood drug levels should be
> evaluated in conjunction with all other evidence to
> determine the extent of compliance. When the reported
> blood drug levels are low, therefore, the information
> obtained from the treating source should include the
> physician's statement as to why the levels are low and
> the results of any relevant diagnostic studies concerning
> the blood levels. Where adequate seizure control is
> obtained only with unusually large doses, the possibility
> of impairment resulting from the side effects of this
> medication must also be assessed. 20 C.F.R. Pt. 404,
> Subpt. P, App. I., 11.00 Neurological - Adult A. Epilepsy

Plaintiff maintains that the ALJ failed to engage in this required analysis.

In assessing the severity of plaintiff's seizure disorder at step 3 of the

sequential evaluation process, the ALJ also failed to take into account the

testimony of plaintiff regarding his seizures (Tr. 34-45) and the statements

provided by plaintiff's father-in-law regarding the nature and severity of his

seizures. (Tr. 190-91, 194-201). The Commissioner's regulations require that

such testimony be considered:

> A. *Epilepsy*. In epilepsy, regardless of etiology, degree of impairment will be determined according to type, frequency, duration, and sequelae of seizures. At least one detailed description of a typical seizure is required. Such description includes the presence or absence of aura, tongue bites, sphincter control, injuries associated with the attack, and postictal phenomena. The reporting physician should indicate the extent to which description of seizures reflects his own observations and the source of ancillary information. ***Testimony of persons other than the claimant is essential for description of type and frequency of seizures if professional observation is not available***. 20 C.F.R. Pt. 404, Subpt. P, App. I. 11.00 Neurological - Adult A. Epilepsy (emphasis added).

According to plaintiff, lay testimony regarding the severity of a claimant's seizure

disorder is very critical in a claim for DIB and SSI at steps three and four of the

sequential evaluation process. *See Smith v. Bowen*, 849 F.2d 1222, 1226 (9th Cir.

1988) (lay testimony used to establish seizure severity and frequency required

under Listing 11.02); *Braswell v. Heckler*, 733 F.2d 531, 533 (8th Cir. 1984)

(same). Plaintiff testified that he was still experiencing seizures about five to six

times a month despite being compliant with his medication. (Tr. 39-40, 44). He

also explained that stress increases the frequency of his seizures (Tr. 44) and that

8

he was having about eight seizures a month while he was working.  (Tr. 38).

Plaintiff testified that he had to give up his driver's license because of his seizures.

(Tr. 44).

Dennis J. Frost, plaintiff's father-in-law, completed a third-party "Function

Report" dated July 27, 2011, regarding the severity of plaintiff's seizure disorder

(Tr. 194-201) as well as a seizure report dated July 23, 2011, indicating that

plaintiff had as many as 3 to 4 seizures a week.  (Tr. 190-91).  He had known

plaintiff for four years at that point in time and he explained in detail the nature of

plaintiff's seizures and their resulting effects on his ability to function (Tr.

194-201).  Had Mr. Frost's testimony been given appropriate weight, plaintiff says

that the ALJ should have found that his seizure disorder was of listing level

severity.  The ALJ would later say in her decision that she gave "some weight" to

Mr. Frost's statements regarding the frequency and severity of plaintiff's seizures.

(Tr. 22).  However, according to plaintiff, it is unclear how much weight she gave

them and what statements from Mr. Frost she accepted as true and which

statements she rejected.  Plaintiff maintains that it is evident that she gave Mr.

Frost's statements no consideration in her listing level analysis.  (Tr. 18).

According to plaintiff, the ALJ's step three finding is based purely on

innuendo and her own lay assessment of the medical and lay evidence of record.

The ALJ failed to have the medical evidence of record reviewed by a consultative

physician and the opinion of Dr. Buday that plaintiff's seizure disorder was of

listing level severity stands un-rebutted.  When evaluating Social Security claims,

the United States Supreme Court has specified that it is the duty of the ALJ to

"investigate the facts and develop the arguments both for and against granting

benefits." *See Sims v. Apfel*, 530 U.S. 103, 111 (2000).  Consistent with this,

Agency regulations dictate that an ALJ has an affirmative duty to make every

reasonable effort to help a claimant develop a complete medical record.  20 C.F.R.

§§ 404.1512(d), 416.912(d). According to plaintiff, the ALJ did not meet this

basic obligation in this case.  To this end, Agency regulations provide that an ALJ

will recontact a treating source, whenever the record is inadequate.  *See* 20 C.F.R.

§§ 404.1516(e), 416.916(e); §§ 404.1512(f); 416.912(f); *see also* SSR 85-16, 1985

WL 56855 *3 (stating that when the medical source notes appear to be incomplete,

recontact with the medical source should be made to attempt to obtain more

detailed information for an RFC determination); 56 Fed. Reg. 36932-01, 36950-51

(stating that the intent of regulations §§ 404.1527(b) and (c) is "to require"

recontacting treating sources to resolve inconsistencies); *c.f. Ferguson v.*

*Commissioner of Social Sec*., 628 F.3d 269, 271-75 (6th Cir. 2010).  Under the

facts and circumstances of this case, plaintiff argues that a remand is warranted for

an award of benefits. In the alternative, remand is required and if the ALJ is once

again unwilling to accept Dr. Buday's opinion on this issue, the ALJ should be

10

directed to obtain an opinion from an acceptable medical source on this critical

issue, or be required to recontact Dr. Buday.

The ALJ in this case failed to give appropriate deference to the opinions of

plaintiff long-time treating Board-certified neurologist, Dr. Buday.  In the

hierarchy of evidentiary weight, Dr. Buday's medical opinions are entitled to the

greatest degree of deference, and since they stand un-rebutted, should have been

given controlling weight in this case.  If the ALJ desired to give little weight to Dr.

Buday's opinions, she should have had a medical expert review the evidence of

record, but she failed to do so in this case.  The only real analysis of the findings

of Dr. Buday by the ALJ are set forth in the ALJ's analysis of plaintiff's RFC.

(Tr. 20-22).  While the ALJ acknowledged in this section of her decision that Dr.

Buday opined in June 2012 that plaintiff met Listing 11.02 for epilepsy, she stated

that this "opinion is not supported or consistent with his treatment notes that the

claimant was possibly noncompliant with medication prescribed and the record,

including inconsistencies in the claimant's report."  (Tr. 21-22).  She, therefore,

found that this assessment "is unreasonable and gave it little weight."  (Tr. 22).

However, reading all of Dr. Buday's treatment records together, along with blood

level testing that shows that plaintiff was compliant with his medications (Tr.

285-89, 293, 297), plaintiff argues that there is no direct medical evidence

contrary to Dr. Buddy's opinion.  While the ALJ believed there was a "possibility"

11

that plaintiff was noncompliant with his prescribed anti-seizure medication, there is no direct evidence to support such a conclusion by the ALJ and all the blood tests of record are to the contrary. (Tr. 285-89, 293, 297). According to plaintiff, the ALJ simply failed to consider the blood drug levels in this case. In light of the fact that there is no medical evidence of record that contradicts Dr. Buday's findings, the ALJ assessment of Dr. Buday's opinion cannot withstand judicial scrutiny. Plaintiff maintains that the ALJ in this case simply substituted her own lay opinion for that of a long-time treating physician who is a Board-certified neurologist. The ALJ, in giving no deference to the opinions of Dr. Buday, failed to factor in the analysis required by the Commissioners's own regulations. 20 C.F.R. §§ 404.1527(c), 416.927(c). This analysis from the ALJ is notably absent in this case. Dr. Buday has been Mr. Willette's treating neurologist for well over a decade and he is Board certified in his field of specialization. No doctor has refuted any of his findings in this case. Under the circumstances of this case, plaintiff contends that the ALJ's analysis of Dr. Buday's opinions cannot be found to be in accordance with the Commissioner's own regulations and policies and cannot withstand judicial scrutiny.

Plaintiff also argues that the ALJ failed to correctly assess his credibility and failed to give appropriate weight to the statements made by Mr. Frost, plaintiff's father-in-law, regarding the frequency and nature of his seizures. Not

12

only did the ALJ not factor the testimony of plaintiff regarding his seizures and the statement from Mr. Frost regarding the frequency and nature of plaintiff's seizures into her step three analysis, the ALJ failed to properly assess their credibility in assessing the RFC. In this case, the ALJ found that plaintiff's allegations "are credible to the extent that they are consistent with the limitations in the residual functional capacity." (Tr. 21). According to plaintiff, such an assessment puts the "cart before the horse." The ALJ should first determine the credibility of a claimant's subjective and objective complaints and then assess his RFC, in this case, the ALJ apparently did just the opposite. For this reason alone, the ALJ's assessment of plaintiff's credibility should not be sustained.

Furthermore, the ALJ noted that plaintiff made "inconsistent statements" and also that he demonstrated a "lack of candor during testimony and in other documents/reports cast serious doubt on his credibility." (Tr. 21). The only clarification the ALJ provided for this statement is that the claimant collected unemployment benefits. (Tr. 21). According to plaintiff, the ALJ should not have held his receipt of unemployment benefits against him "given the benevolent nature of the Social Security Act." The SSA encourages claimants to seek employment despite disabilities, and the fact that plaintiff held himself out as employable does not mean that he is not disabled. The ALJ in this case failed to follow the former Chief ALJ Cristaudo's August 10, 2010 memorandum to ALJs,

reminding them that the receipt of unemployment benefits does not preclude the receipt of disability benefits. The Chief ALJ referenced SSR 0-1c, which incorporates *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795 (U.S. 1999), holding that a claim for disability benefits is consistent with a claim for relief under the American with Disabilities Act. According to the Chief ALJ, the receipt of unemployment benefits is just one of the factors that the ALJ must consider in determining disability. In this case, plaintiff maintains that it was the sole and primary reason for her credibility assessment. *See* Receipt of Unemployment Insurance Benefits by Claimant Applying for Disability Insurance – REMINDER (National Chief Administrative Law Judge Frank Cristaudo's Policy Statement of August 9, 2010. Plaintiff points out that he had a wife and young daughter to support and his wife did not work outside the home. (Tr. 42). Plaintiff was not a man of financial means as reflected by the fact that his income and resources are low enough to qualify for SSI benefits. Plaintiff contends that the ALJ failed to take into consideration these key factors.

With regard to the ALJ's assessment of Mr. Frost's credibility, the ALJ correctly recited some of the key points of Mr. Frost's written statements to SSA. (Tr. 22). For instance, the ALJ correctly pointed out that Mr. Frost stated that plaintiff had three to four seizures a week, that his ability to do household chores and drive a car was affected by his seizures, and that he experienced disorientation

14

and staring at times, and his memory was affected by seizures. (Tr. 22). However, the ALJ provided no analysis of Mr. Frost's credibility other than to find that: "I gave some weight to this opinion to the extent that it shows his perception of the claimant's impairments." (Tr. 22). Plaintiff maintains that it is impossible for the claimant and for the Court to ascertain what the ALJ actually meant by this statement and exactly how much weight the ALJ gave Mr. Frost's statements. According to plaintiff, it does not satisfy the requirements set forth in SSR 96-70. Plaintiff says that had the ALJ accepted Mr. Frost's statements, the ALJ should have found he satisfied the criteria of Listing 11.02. At a minimum, the ALJ should have found that plaintiff was incapable of performing his past work as a stocker.

In addition to having epilepsy since he was 13 years old, Mr. Willette also suffered from two other medical problems. One was obesity which the ALJ found to be a non-severe impairment. (Tr. 17). The other was borderline intellectual functioning, and although the ALJ found it to be severe, the ALJ never considered that his intelligence was decreasing, quite likely due to his epilepsy. The ALJ failed to take either impairment into consideration when assessing his RFC. In this case, plaintiff was not only obese, but he had a BMI of 43.5 which placed him in the class III very severely obese range category. Plaintiff contends that the ALJ's failure to specifically address the effects of his obesity is especially

15

troubling, because the Commissioner has actually promulgated a policy interpretation, which requires ALJs to consider the effect of obesity and "explain how [the ALJ] reached [her] conclusions on whether obesity caused any physical or mental limitations." *See* SSR 02-1p, 2000 WL 628049 *7.  Furthermore, the records from Dr. Buday show that plaintiff's weight dramatically increased over the relevant period from 220 pounds to 278 and that he was experiencing excessive weight and de-conditioning.  (Tr. 52, 62, 65, 159, 282-84, 291-92, 296, 299).  According to plaintiff, both conditions taken together would have an instrumental effect on his RFC and was a factor the ALJ never considered in finding that plaintiff could perform full-time work on a regular basis at all exertional levels.

Furthermore, the ALJ never considered the fact that during the time period at issue in this case, plaintiff's weight was on a steady increase, further showing that his overall medical condition was deteriorating.  (Tr. 52, 62, 65, 159, 282-84, 291-92, 296, 299).  As plaintiff's weight increased steadily after he developed epilepsy, plaintiff says the medical evidence also shows that his level of intelligence was decreasing since he was first diagnosed with the condition.  When he was still attending school, his IQ scores were in the average to low average range of intelligence (Tr. 255), but after suffering seizures for over a decade his intelligence is now in the borderline range of intellectual functioning.  (Tr. 239-31,

16

251-53, 275-77).  Joe DeLoach, Ph.D., a psychologist, reviewed the record for the state agency in November 2011 and concluded that plaintiff had an organic mental disorder with moderate difficulties in maintaining concentration, persistence, or pace.  (Tr. 56, 66).  This finding, ignored by the ALJ, is consistent with plaintiff's decreasing level of intelligence.  Even more significant, the ALJ failed to consider the additional functional impact of how plaintiff's severe obesity and borderline intellectual functioning would have when considered in combination with his seizure disorder.  *See* 20 C.F.R. §§ 404.1523, 416.923 (requiring ALJs to consider the combined effects of a claimant's severe and non-severe impairments); *see also* SSR 02-1p, 2000 WL 628049 *6-7 (requiring the ALJ to consider and explain the combined effects of obesity and all of the claimant's other medically-established impairments).  According to plaintiff, this is just one of several reasons why the ALJ should have obtained a medical expert to review all the evidence of record if she was not going to give deference to the medical opinions of Dr. Buday.

The ALJ found plaintiff not disabled at the fourth step of the sequential evaluation process, finding that he could perform his past work as a stocker.  (Tr. 19-23).  The ALJ assessed plaintiff's RFC and found that he could perform a full range of work at all exertional levels but with the nonexertional limitations normally associated with a seizure disorder.  (Tr. 19-22).  According to plaintiff, this RFC assessment and resulting finding that plaintiff could perform his past

work as a stocker was erroneously reached and is not supported by any medical

opinion evidence of record.  Here, the reports from Dr. Buday showing that

plaintiff was still having at least one seizure a month despite medical compliance,

and that his condition satisfied listing 11.02 is consistent with a finding that his

seizure disorder was disabling.  No medical evidence of record contradicts this

finding.  In addition, no doctor of record has determined that plaintiff was capable

of performing regular full-time employment at all exertional levels.  According to

plaintiff, such a finding is inconsistent with Dr. Buday's reports of continuing

seizures and is not supported by any medical evidence.

     C.    <u>The Commissioner's Motion for Summary Judgment</u>

     The Commissioner urges the Court to affirm the ALJ's Listing analysis.

Listing 11.02 requires a showing of:

> convulsive epilepsy, (grand mal or psychomotor),
> *documented by detailed description of a typical seizure
> pattern*, including all associated phenomena; *occurring
> more frequently than once a month in spite of at least 3
> months of prescribed treatment*.
>
> A. Daytime episodes (loss of consciousness and
> convulsive seizures) or
>
> B. Nocturnal episodes manifesting residuals which
> interfere significantly with activity during the day.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.02 (emphasis added).  Plaintiff claims

that the ALJ "failed to provide sufficient analysis as to whether [his] epilepsy

disorder and resulting seizures satisfied the criteria of Listing 11.02." The

Commissioner contends that the ALJ provided several reasons to support his

listing determination. First, the ALJ found that "[t]he record fails to demonstrate a

documented typical seizure pattern." (Tr. 18). The Commissioner points out that

neither Dr. Buday nor any other medical source in the record documented a typical

seizure pattern, including all associated phenomena; Dr. Buday's notes simply

reflect plaintiff's allegations that he had experienced seizures, nothing more. (Tr.

283, 292, 296, 299). Agency regulations emphasize this requirement, stating that:

> At least one detailed description of a typical seizure is
> required. Such description includes the presence or
> absence of aura, tongue bites, sphincter control, injuries
> associated with the attack, and postictal phenomena. The
> reporting physician should indicate the extent to which
> description of seizures reflects his own observations and
> the source of ancillary information.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.00A. Thus, according to the

Commissioner, because plaintiff cannot point to any records documenting a typical

seizure pattern, including associated phenomena, this Court should reject his

listing argument.

The ALJ also determined that plaintiff's epilepsy did not meet listing 11.02

based on the fact that plaintiff's "treating physician noted [plaintiff's] report of no

recurrence of seizures at the time of [his] alleged onset date and of possible

medication non-compliance since." (Tr. 18). According to the Commissioner,

19

even assuming plaintiff's arguments have merit, his claim that his epilepsy meets

listing 11.02 still fails because he has failed to show that his epilepsy "meets all of

the specified criteria" that relate to the listing. *Sullivan*, 493 U.S. at 530. The

Commissioner again points out that plaintiff does not show that a medical source

has provided a detailed description of a typical seizure pattern, as the listing

requires.

Concerning plaintiff's arguments specifically, plaintiff claims that, while

Dr. Buday's note in May 2011 stated that he was not experiencing any recurrent

seizures, the doctor's subsequent notes state otherwise. He also maintains that the

ALJ failed to consider that, despite the evidence showing possible non-compliance

with medications, his blood test showed that his medication level was within the

therapeutic range during the period at issue. The Commissioner acknowledges the

evidence plaintiff cites arguably supports his claim, but asserts that substantial

evidence nonetheless supports the ALJ's rationale. According to the

Commissioner, the ALJ reasonably observed that plaintiff's compliance with

medications was an issue since Dr. Buday's May 2011 treatment note, which

indicated that he was not experiencing seizures. Significantly, in April 2012,

plaintiff reported experiencing "some seizures," and Dr. Buday observed that

plaintiff's blood work showed that his medication level was "therapeutic, but in

the lower therapeutic range." (Tr. 296). The doctor then advised plaintiff that he

needed to be compliant with his medications and that "if he would be more

compliant we should be able to bring these [seizures] under better control for him"

(*Id*.).  Dr. Buday's subsequent treatment note in October 2012 likewise fails to

support plaintiff's claim that he was compliant with his medications, as required

under the listing.  There, plaintiff told Dr. Buday that he had experienced four

seizures in a single weekend, yet the doctor noted that he had failed to contact his

office despite these seizures, so his medication levels could not be tested at the

time.  (Tr. 299).  In short, plaintiff relies on a single blood test showing that his

medications were within the therapeutic range (Tr. 297), "but in the lower

therapeutic range" according to his doctor (Tr. 296), to argue that the listing's

medication compliance requirement was met.  Yet, as set forth above, substantial

other evidence reasonably supports the ALJ's finding that the record suggested

that he was not fully compliant with treatment.  Indeed, his own doctor stated that,

if plaintiff was compliant, he expected the seizures to be under control.  (Tr. 296).

*See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) ("[T]he

Commissioner's decision cannot be overturned if substantial evidence, or even a

preponderance of the evidence, supports the claimant's position, so long as

substantial evidence also supports the conclusion reached by the ALJ.").

According to the Commissioner, the ALJ therefore reasonably concluded that

plaintiff's epilepsy did not meet listing 11.02 based on his poor medication

compliance.

The Commissioner urges the Court to reject plaintiff's argument that the ALJ's step-three listing analysis requires remand because the ALJ failed to adequately consider the opinion of Dr. Buday that his epilepsy met listing 11.02. The Commissioner points out that, contrary to plaintiff's argument, the ALJ expressly considered the doctor's opinion at the RFC stage. (Tr. 21-22). Thus, there is no error. *See Benson v. Comm'r of Social Sec.*, 2013 WL 3242246, at *7 (E. D. Mich. 2013) (finding evidence considered by the ALJ at the RFC stage can support the ALJ's listing analysis at step three). While the opinions of a claimant's treating medical source are generally entitled to deference, the Commissioner points out that the ALJ may discount such opinions where they are inconsistent with other substantial evidence in the record. *Bogle v. Sullivan*, 998 F.2d 342, 347-348 (6th Cir. 1993) ("[t]his court has consistently stated that the Secretary is not bound by the treating physician's opinions, and that such opinions receive great weight only if they are supported by sufficient clinical findings and are consistent with the evidence."). The Commissioner contends that, here, the ALJ found that Dr. Buday's opinion was entitled to "little weight" because it was inconsistent with his treatment notes, which suggested that plaintiff was not compliant with his seizure medications. (Tr. 21-22). Notwithstanding plaintiff's argument to the contrary, the Commissioner maintains that the ALJ reasonably

22

determined that Dr. Buday's treatment notes belied a finding that plaintiff's epilepsy met the listing requirements.

The Commissioner also asserts that plaintiff's claim that the ALJ failed to analyze the factors set forth in 20 C.F.R. §§ 404.1527(c), 416.927(c) is also without merit. "Although the regulations instruct an ALJ to consider these factors, they expressly require only that the ALJ's decision include good reasons ... for the weight ... give[n] [to the] treating source's opinion – not an exhaustive factor-by-factor analysis." *Francis v. Comm'r Social Sec. Admin*., 414 Fed. Appx. 802, 804 (6th Cir. 2011) (internal citations omitted). According to the Commissioner, the ALJ here provided "good reasons" to discount Dr. Buday's opinion and nothing more is required.

Plaintiff also appears to claim that the ALJ lacked the discretion to reject Dr. Buday's opinion without first securing "a medical expert review" of the record evidence. According to the Commissioner, "[a]n ALJ has discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary." *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001). Again, the Commissioner says that the ALJ in this case identified sufficient evidence for finding that plaintiff's epilepsy did not meet listing 11.02. Under these circumstances, the ALJ was not required to secure further medical evidence or the opinion of another medical source. *See Allen v. Comm'r of Social Sec*., 2013 WL

23

5423728, at *3 (E. D. Mich. 2013) (ALJ is not required to further develop the record when he properly determined that good reasons supported the rejection of a treating doctor's opinion).

Plaintiff claims that the ALJ did not adequately evaluate his credibility and the third-party statement from Mr. Frost, and argues that this deficiency affected the ALJ's listing analysis. Regarding the ALJ's analysis of his credibility, plaintiff first faults the ALJ for putting the "cart before the horse." Specifically, he cites the ALJ's statement that his allegations "are credible to the extent that they are consistent with the limitations in the [RFC]," and claims that this boilerplate language shows that the ALJ impermissibly determined his RFC before evaluating the credibility of his complaints. *Id*. However, irrespective of the propriety of the ALJ's boilerplate language, the Commissioner points out that this Court does not end its review there; rather, it looks to the ALJ's credibility determination as a whole and whether the ALJ identifies substantial evidence in the record to support it. *See Fowler v. Comm'r of Social Sec.*, 2014 WL 1304997, at *8-9 (E.D. Mich. 2014). Here, the ALJ found that plaintiff was not entirely credible based on multiple factors, including several inconsistencies between his testimony and information contained in the medical record, plaintiff's mostly conservative treatment history, and the fact that he collected unemployment benefits. (Tr. 21). For instance, the ALJ noted that, while plaintiff testified that

he experienced multiple seizures per month during the period at issue (Tr. 39), he told Dr. Buday in May 2011 that he had not experienced any recurrent seizures. (Tr. 292).

Of the factors that the ALJ cited in evaluating plaintiff's credibility, plaintiff only takes issue with the ALJ's consideration of the fact that he collected unemployment benefits while simultaneously alleging disability. (Pl. Br. at 16). He claims that the ALJ placed undue weight on this factor. *Id*. The Commissioner contends that the ALJ not only relied on plaintiff's collection of unemployment benefits to find that he was not fully credible, he relied on several other factors. (Tr. 21). Plaintiff does not dispute that the ALJ can consider a claimant's collection of unemployment benefits as one of several adverse factors affecting the claimant's credibility. Accordingly, the Commissioner maintains that plaintiff does not establish any error in the ALJ's reasons for finding him not fully credible.

With respect to the ALJ's consideration of the third-party report that Mr. Frost completed, plaintiff faults the ALJ for providing an ambiguous statement, which did not make clear what weight she assigned to the report. Yet, while "an ALJ must consider the lay testimony [of a third-party], he is not required to spell out in his decision what weight he gave to the testimony." *Walters v. Comm'r of Social Sec.*, 2013 WL 1364719, at *14 (E.D. Mich. 2013), quoting *Patrick v. Astrue*, 2008 WL 3914921, at *2 (E.D. Ky. 2008). Further, "[t]he testimony of lay

25

witnesses… is entitled to perceptible weight only if it is fully supported by the reports of the treating physicians." *Simons v. Barnhart*, 114 Fed. Appx. 727, 733 (6th Cir. 2004) (citation omitted). Here, according to the Commissioner, Mr. Frost's third party report did not provide any new information that would have altered the ALJ's decision. Plaintiff notes that "the ALJ correctly pointed out that Mr. Frost stated that [plaintiff] had three to four seizures a week, that his ability to do household chores and drive a car was affected by his seizures, and that he had disorientation and staring at times, and his memory was affected by seizures." This information, however, is not particularly different from plaintiff's testimony, which the ALJ reasonably rejected. Also, it stands in contrast with the substantial evidence the ALJ relied on to find that plaintiff's epilepsy did not meet listing 11.02 – namely, the medical evidence showing non-compliance with medication and the absence of a doctor's detailed documentation of a seizure disorder. For all these reasons, the Commissioner maintains that plaintiff is not entitled to remand based on the ALJ's evaluation of the credibility of either his testimony or Mr. Frost's third-party report.

The Commissioner points out that plaintiff only challenges the RFC finding insofar as he argues that the ALJ did not adequately consider the effects of his obesity and the fact that his "intelligence was decreasing" due to his epilepsy. With respect to his obesity, plaintiff claims that the ALJ should have found that it

26

severely affected his RFC. According to the Commissioner, in support of this

severely affected his RFC.  According to the Commissioner, in support of this

argument, plaintiff simply points to his weight during the relevant period and the

fact that Dr. Buday repeatedly observed that he had gained weight.  *Id*.  Yet, he

fails to point to any evidence showing how his obesity affected his RFC; as such,

the Commissioner contends that his argument fails.  *See Reynolds v. Comm'r of

Social Sec.*, 424 Fed. Appx. 411, 416 (6th Cir. 2011); *Long v. Apfel*, 1 Fed. Appx.

326, 333 (6th Cir. 2001).  In fact, plaintiff testified during the hearing that the only

condition that affected his RFC was his epilepsy (Tr. 40) (stating that no physical

issues apart from his seizures affected his ability to work).

The Commissioner next contends that plaintiff's argument that his

intellectual functioning decreased due to his seizures, and that the ALJ failed to

account for such decreased functioning is also without merit.  The ALJ here

formulated the mental portion of his RFC finding based on the opinion of Dr. Joe

DeLoach, the state agency reviewer (see Tr. 21) (assigning "considerable weight"

to the doctor's opinion).  Dr. DeLoach is the only doctor who has completed a

mental RFC assessment in the record, and his opinion is consistent with the ALJ's

decision.  (Compare Tr. 19 with Tr. 59-60).  To the extent plaintiff now alleges

that a more restrictive mental RFC is warranted, the Commissioner would note

that during the hearing he in fact testified that he did not experience any mental

issues affecting his ability to work.  (Tr. 40).  Accordingly, the Commissioner

maintains that plaintiff's arguments that the ALJ did not adequately consider the effects of his obesity and alleged decreased mental functioning are without merit.

Finally, the Commissioner asserts that substantial evidence supports the ALJ's decision that plaintiff could perform his past relevant work. Plaintiff challenges the step four finding by asserting that if the ALJ's decision is deficient at the listing and RFC stages, the ALJ's resulting step-four determination also fails. According to the Commissioner, because plaintiff's arguments that the ALJ's listing analysis and RFC finding are unsupported are without merit; by implication, plaintiff should take nothing from his step-four argument.

D.    Plaintiff's Reply

In reply, plaintiff says that both the ALJ and the Commissioner's counsel, fail to acknowledge that Dr. Buday reported on June 25, 2012, that plaintiff suffered from convulsive epilepsy with daytime episodes with loss of consciousness and convulsive seizures as well as seizures with alteration of awareness. (Tr. 298). In addition, plaintiff provided a detailed description of the nature of his seizures through the observations and written reports from his father-in-law, Dennis Frost. (Tr. 190-91, 194-201). Plaintiff asserts that a third party description of a claimant's seizure activity is acceptable information regarding a claimant's seizure pattern because due to the nature of the impairment, a complete description cannot be given by a claimant, and the claimant's physician

28

may never actually witness the patient experience a seizure.  *See* SSR 87-6, 1987 WL 109184.  According to plaintiff, the Commissioner fails to understand that a description of a claimant's seizure disorder does not necessarily have to come from a doctor, as first hand professional observation is not always available.  The Commissioner's own regulations permit the required description of a claimant's seizures to come from a third party.  20 C.F.R. Pt. 404, Subpt. P, App 1, Section 11.00 ("Testimony of persons other than the claimant is essential for description of type and frequency of seizures if professional observation is not available."); *see also*, SSR 87-6 ("[I]f professional observation is not available, it is essential that a description be obtained from a third party (i.e. family member, neighbor, etc.)").  In this case, plaintiff says that he satisfied the criteria of Listing 11.02 by providing evidence concerning the nature of his seizures from the report of Dr. Buday (Tr. 298) and by the reports from his father-in-law, Mr. Frost.  (Tr. 190-91, 194-201).

Much of the Commissioner's argument to the Court that there was substantial evidence to support the ALJ's step three finding that plaintiff's seizure disorder was not of listing level severity is based on the argument that he was not compliant with taking his anti-seizure medication.  The Commissioner's counsel goes so far as to state that: "In short, plaintiff relies on a single blood test showing that his medications were within the therapeutic range (Tr. 296), to argue that the

29

listings medication requirement was met." (Def's Br. at 9). According to plaintiff, this is a gross misstatement of his argument and a gross distortion of the evidence of record. Plaintiff actually pointed out in his opening brief that all the blood level tests of record showed that his anti-seizure medication levels were in the therapeutic range. Such tests occurred on September 7, 2010, March 28, 2011, and December 15, 2011. (Tr. 285-89, 293, 297). Plaintiff acknowledges that Dr. Buday noted in his report of April 30, 2012 that he told plaintiff that he needs to be compliant with medications "if he is noncompliant [] it is difficult to bring him under control. I think that if he would be more compliant we should be able to bring these under better control for him." (Tr. 296). But plaintiff asserts that this single suggestion by Dr. Buday was not sufficient for the ALJ to conclude that there was "possible medical non-compliance" and to conclude that plaintiff's seizure activity was not of listing level severity. (Tr. 18). According to plaintiff, if the ALJ suspected possible non-compliance, he should have re-contacted Dr. Buday as set forth in SSR 87-6, or obtained blood drug level testing through a purchased examination as the ruling requires. The partly adversarial, partly inquisitorial, procedure for adjudicating social security claims requires the ALJ to order additional tests if necessary to render an informed disability determination. *See Smith v. Apfel*, 231 F.3d 433, 437-38 (7th Cir. 2000); SSR 87-6 (requiring ALJs to solicit further evidence on a treating physician's ambiguous report of

ongoing seizures).  *See Johnson v. Sec'y of Health and Human Servs.*, 794 F.2d 1106, 1111 (6th Cir. 1986) (concluding that when it appeared that the plaintiff might satisfy the criteria of a listing but the record was insufficient to show whether they were satisfied, the ALJ had a duty to "develop the factual record fully and fairly").  According to plaintiff, the ALJ's non-compliance argument is wrongly premised upon the one isolated comment by Dr. Buday and is refuted by Dr. Buday's subsequent statement of June 25, 2012, that his seizure disorder was of listing level severity and that he was having more than one seizure a month in spite of at least three months of prescribed treatment.  (Tr. 298).  The Commissioner relies on just one statement of Dr. Buday and turns a "suggestion" (the exact word used by the Commissioner at page 10 of her brief) that plaintiff could have been more compliant and uses it to make a finding that he was non-compliant with his medication and therefore cannot satisfy the requirements of Listing 11.02.  Plaintiff asserts that one piece of evidence that at best only "suggests" non-compliance can hardly be considered substantial evidence of non-compliance when there are no direct statements by any doctor that he was not compliant in taking his medication and all the blood tests of record are within the therapeutic range.

The Commissioner is correct that the ALJ never mentioned Dr. Buday's report indicating he believed plaintiff's seizure disorder was of listing level

severity in her step-three analysis section of her decision. However, the
Commissioner argues that the ALJ did mention it in her discussion of plaintiff's
RFC, and that such was sufficient to support her step three finding. According to
plaintiff, however, a review of the ALJ's discussion of this report shows the ALJ's
analysis of this opinion is not sufficient to withstand judicial review because all
the ALJ said about Dr. Buday's opinion is as follows:

> The claimant's treating physician, John M. Buday, M.D.,
> opined in June 2012 that the claimant met the 11.02
> listing for epilepsy (6F). This opinion is not supported or
> consistent with his treatment notes that the claimant was
> possibly noncompliant with medication prescribed and
> the record, including inconsistencies in the claimant's
> report. Therefore, I find that this assessment is
> unreasonable and gave it little weight. (Tr. 21-22).

The ALJ analysis of Dr. Buday's opinion in the RFC section of her decision, or
rather the lack of analysis thereof, fails to satisfy the requirement that an ALJ
explain why the claimant's treating physician's opinion is not entitled to
deference. According to plaintiff, the ALJ fails to point out how Dr. Buday's
opinion is inconsistent with any other evidence of record. Although the
Commissioner contends the ALJ "identified sufficient evidence for finding that
plaintiff's epilepsy did not meet listing 11.02", plaintiff contends that the ALJ
does not cite to any evidence other than Dr. Buday's one-time statement that Mr.
Willette's seizures might be better controlled if he was more compliant with his

32

medication, despite the fact his medication levels were at therapeutic levels.

According to plaintiff, much of the Commissioner's brief posits reasons for rejecting key pieces of evidence which the ALJ ignored or did not explain why she did not find credible.  Plaintiff maintains that these post-hoc rationalizations are improper.  *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 and 94 (1943) (holding the "grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based," and "the courts cannot exercise their duty of review unless they are advised of the considerations underlying the actions under review"); *Hurst v. Secretary of Health and Human Services*, 753 F.2d 517, 519 (6th Cir. 1985) (holding that articulation of the ALJ's reasons for crediting or rejecting particular sources of evidence is "absolutely essential for meaningful appellate review").  Plaintiff asserts that the ALJ was required to provide a more thoughtful analysis, as opposed to cherry-picking evidence adverse to plaintiff.  According to plaintiff, on appeal, the Commissioner here seeks to offer factual findings and legal conclusions that the ALJ did not actually make, especially with regard to the assessment of the credibility of plaintiff's testimony and the reports provided by Mr. Frost regarding his statements concerning Mr. Willette's seizure disorder.  SSA attorneys seek to become the administrative fact-finder, however, they have no statutory authority to do so.  In this case, SSA attorneys go beyond improper post-hoc rationalizations

33

and seek to offer substantive factual and legal determinations that the ALJ never made.

## III.    DISCUSSION

### A.    Standard of Review

In enacting the social security system, Congress created a two-tiered system in which the administrative agency handles claims, and the judiciary merely reviews the agency determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137 (1987). If relief is not found during this administrative review process, the claimant may file an action in federal district court. *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir.1986).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding

whether substantial evidence supports the ALJ's decision, "we do not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may ... consider the credibility of a claimant when making a determination of disability."); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, particularly since the ALJ is charged with observing the claimant's demeanor and credibility.") (quotation marks omitted); *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247, quoting Soc. Sec. Rul. 96-7p, 1996 WL 374186, *4.

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, this Court may not reverse the

Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers*, 486 F.3d at 241; *Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted), citing, *Mullen*, 800 F.2d at 545.

The scope of this Court's review is limited to an examination of the record only. *Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court must discuss every piece of evidence in the

administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed.Appx. 496, 508

(6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly

addressing in his written decision every piece of evidence submitted by a party.")

(internal citation marks omitted); *see also Van Der Maas v. Comm'r of Soc. Sec.*,

198 Fed.Appx. 521, 526 (6th Cir. 2006).

>    B.    Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits."

*Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994);

*accord*, *Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed.Appx. 515, 524 (6th Cir. 2003).

There are several benefits programs under the Act, including the Disability

Insurance Benefits Program (DIB) of Title II (42 U.S.C. §§ 401 *et seq*.) and the

Supplemental Security Income Program (SSI) of Title XVI (42 U.S.C. §§ 1381 *et

seq*.). Title II benefits are available to qualifying wage earners who become

disabled prior to the expiration of their insured status; Title XVI benefits are

available to poverty stricken adults and children who become disabled. F. Bloch,

Federal Disability Law and Practice § 1.1 (1984). While the two programs have

different eligibility requirements, "DIB and SSI are available only for those who

have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).

"Disability" means:

>    inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); *see also* 20 C.F.R. § 416.905(a)

(SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments, that "significantly limits ... physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits

are denied.

*Carpenter v. Comm'r of Soc. Sec.*, 2008 WL 4793424 (E.D. Mich. 2008), citing, 20 C.F.R. §§ 404.1520, 416.920; *Heston*, 245 F.3d at 534.  "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates."  *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work."  *Jones*, 336 F.3d at 474, cited with approval in *Cruse*, 502 F.3d at 540.  If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner.  *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC and considering relevant vocational factors."  *Rogers*, 486 F.3d at 241; 20 C.F.R. §§ 416.920(a)(4)(v) and (g).

If the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if the court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan*, 474 F.3d at 833; *Mullen*, 800 F.2d at 545.  In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

C.    <u>Analysis and Conclusions</u>

1.    Listing and Epilepsy

A claimant's impairment must meet every element of a Listing before the

Commissioner may conclude that he or she is disabled at step three of the

sequential evaluation process.  *See* 20 C.F.R. § 404.1520; *Duncan v. Sec'y of*

*Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986).  The claimant has the

burden to prove that all of the elements are satisfied. *King v. Sec'y of Health &*

*Human Servs.*, 742 F.2d 968, 974 (6th Cir. 1984).  The regulations provide that in

making a medical equivalence determination, the Social Security Administration

will "consider the opinion given by one or more medical or psychological

consultants designated by the Commissioner."  20 C.F.R. § 404.1526(c).

Nevertheless, "[t]he burden of providing a ... record ... complete and detailed

enough to enable the Secretary to make a disability determination rests with the

claimant." *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th

Cir. 1986).  It is not sufficient to come close to meeting the conditions of a Listing.

*Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir.1989) (Commissioner's decision

affirmed where medical evidence "almost establishes a disability" under Listing).

For her step three determination regarding section 11.00, the ALJ stated as

follows:

40

> The claimant's seizure disorder does not meet or
> medically equal listing 11.02 (grand mal or
> psychomotor) of the Appendix 1 impairments. The
> record fails to demonstrate a documented typical seizure
> pattern occurring more frequently than once a month, in
> spite of at least three months of prescribed treatment
> with nocturnal episodes manifesting residuals, which
> interfere significantly with activity during the day. The
> claimant's treating physician noted the claimant's report
> of no recurrence of seizures at the time of the claimant's
> alleged onset date and of possible medication
> non-compliance since (3F, 5F). Therefore, the claimant's
> seizure disorder does not reach listing level severity.

(Dkt. 7-2, Pg ID 56).  Given the conclusory nature of the ALJ's step three

determination, is it not entirely clear what evidence the ALJ relied upon in

concluding that plaintiff did not meet Listing 11.02 or 11.03.  Thus, it seems that

the ALJ did not provide adequate reasoning at step three to facilitate meaningful

review by the Court.  *See Reynolds v. Comm'r Soc. Sec.*, 424 Fed.Appx. 411, 416

(6th Cir. 2011) ("In short, the ALJ needed to actually evaluate the evidence,

compare it to [ ] the Listing, and give an explained conclusion, in order to

facilitate meaningful review.").

However, as observed in *Hart v. Soc. Sec. Comm'r*, 2015 WL 4365463

(S.D. Ohio 2015), a remand is not always necessary on this basis.  "The Sixth

Circuit has declined to adopt a blanket rule that remand is required whenever an

ALJ 'provides minimal reasoning at step three of the five-step inquiry.'"  *Wischer*

*v. Comm'r of Soc. Sec.*, 2015 WL 518658, at *12 (S.D. Ohio 2015), quoting

*Forrest v. Comm'r of Soc. Sec.*, 591 Fed.Appx. 359, 365 (6th Cir. 2014). The

Sixth Circuit has found an ALJ's conclusory findings at step three to be harmless

error where the plaintiff did not put forth sufficient evidence to demonstrate that

his or her impairments met or medically equaled the severity of the listing. *See*

*Smith–Johnson v. Comm'r of Soc. Sec.*, 579 Fed.Appx. 426, 432 (6th Cir. 2014);

*see also Forrest*, 591 Fed.Appx. at 365, citing *Reynolds*, 424 Fed.Appx. at 416

(finding that an ALJ erred by providing no reasons to support his finding that a

specific listing was not met, and holding that the error was not harmless because it

was possible that the claimant has put forward sufficient evidence to meet the

listing). Thus, where the ALJ does not properly evaluate a listing, the court must

"determine whether the record evidence raises a substantial question as to

[Plaintiff's] ability to satisfy each requirement of the listing." *Smith-Johnson*, 579

Fed.Appx. at 432-33. The claimant "must point to specific evidence that

demonstrates he [or she] reasonably could meet or equal every requirement of the

listing." *Id*. at 432. "Absent such evidence, the ALJ does not commit reversible

error by failing to evaluate a listing at Step Three." *Id*. at 433.

As explained in *Hart v. Soc. Sec. Comm'r*, where the ALJ has not

adequately explained her step three findings, the issue becomes whether the

plaintiff has raised a substantial question as to whether his seizure disorder meets

or medically equals in severity the requirements of Listing 11.02 or 11.03. The

undersigned concludes, just as in *Hart*, that plaintiff has raised a substantial

question as to whether he meets Listing 11.02 and has submitted evidence

demonstrating that he could reasonably meet every element of the Listing. Listing

11.02 provides as follows:

> 11.02 Epilepsy—convulsive epilepsy, (grand mal or
> psychomotor), documented by detailed description of a
> typical seizure pattern, including all associated
> phenomena; occurring more frequently than once a
> month in spite of at least 3 months of prescribed
> treatment.
>
> A. Daytime episodes (loss of consciousness and
> convulsive seizures) or
>
> B. Nocturnal episodes manifesting residuals which
> interfere significantly with activity during the day.

The Commissioner asserts that the ALJ's Listing analysis is supported by

substantial evidence because there is nothing in the record documenting his typical

seizure pattern. However, the ALJ specifically recounted plaintiff's father-in-

law's statements specifically detailing his typical seizure pattern:

> The claimant's Father-in-law, Dennis J. Frost, Jr., stated
> in a Third-Party Function Report in July 2011 that the
> claimant's ability to do household chores or drive a car
> was affected by his seizure condition. Further, he stated
> that the claimant could not stand for over an hour or
> walk more than a few miles because of fear of having a
> seizure. He said that his memory was affected by his
> condition (6E). Mr. Frost, Jr., also stated in a Seizure
> Questionnaire that the claimant had three to four seizures
> a week that involved rigidity, jerking, eye rolling, tongue

> biting, drooling, and incontinence that afterward he had
> to lie down and rest. He also indicated that the claimant
> had times of disorientation and staring at other times
> (5E).

(Dkt. 7-2, Pg ID 60).  While the ALJ gave this some weight, he did not explain

why this evidence did not satisfy the Listing requirement.  Nothing in the Listing

suggests that such evidence must come from a physician.  Indeed, the

Commissioner's own guidance observes that such evidence may be used and in

some cases, is critical because a physician may have never observed the seizures:

> As set forth in the Listing of Impairments (section
> 11.00A) epilepsy is evaluated according to the type,
> frequency, duration and sequelae of seizures.
> Documentation must include at least one
> electroencephalogram, and at least one detailed
> description of a typical seizure pattern, including all
> associated phenomena. Due to the nature of the
> impairment, a complete description of a seizure cannot
> be obtained from the claimant. Therefore, if professional
> observation is not available, it is essential that a
> description be obtained from a third party (i.e., family
> member, neighbor, etc.). However, before such contact is
> made, the claimant's permission must be obtained.

SSR 87-6.  Thus, just as in *Hart*, plaintiff has provided significant evidence that

supports the Listing in this respect and the ALJ has not explained why this

evidence is insufficient.

The ALJ goes on to conclude that plaintiff's epilepsy does not meet the

Listing for two additional reasons: that his physician reported no recurrence of

seizures around the time of the onset date and because his physician reported, on one occasion, "possible noncompliance" with his medication.  In May, 2011, plaintiff report no recurrence of seizures.  (Dkt. 7-7, Pg ID 335).  In October 2011, plaintiff reported four seizures that month.  (Dkt. 7-7, Pg ID 334).  In April, 2012, plaintiff reported continuing to have seizures.  (Dkt. 7-7, Pg ID 339).  At this point, Dr. Buday indicated that plaintiff's last blood test was in the lower therapeutic range and told plaintiff that he needed to be sure to be compliant with his medications.  However, he also *increased* his Tegretol at this point, suggesting that a higher dose was needed to get his seizures under control. *Id*.  In June, 2012, Dr. Buday opined that plaintiff met Listing 11.01.  (Dkt. 7-7, Pg ID 341).  In October, 2012, plaintiff reported to Dr. Buday that he continued to have seizures, including four in one weekend.  (Dkt. 7-7, Pg ID 342).   Blood level tests of record show that his medication levels were always within therapeutic range.  These tests were done on September 7, 2010, March 28, 2011, and December 15, 2011. (Dkt. 7-7, Pg ID 330, 328, 336).  In this case, on one hand, Dr. Buday, the long-time treating physician, concludes that plaintiff meets the Listing, thus concluding that plaintiff complied with his treatment. On, the other hand, the ALJ concluded that plaintiff was *possibly* non-compliant.

SSR 87-6, which is official guidance from the Commissioner, speaks in terms of "convincing evidence" of compliance or non-compliance.  1987 WL

45

109184, *2.  For example in *Marshall v. Astrue*, 2010 WL 2671256, *6 (S.D. Ohio 2010), citing SSR 97-6, convincing evidence of noncompliance was found because there were more blood tests showing noncompliance than compliance and there was no evidence that the low blood levels were due to anything other than noncompliance.  In circumstances where "convincing evidence" of noncompliance was present, the Court concluded that little weight should be given to test results showing a therapeutic level of an anti-convulsant.  *Id*. at *7.  In such circumstances, there was "enough evidence of noncompliance for a reasonable person to have concluded that plaintiff did not consistently take her medication and that it was not possible to determine the frequency of her seizures had she been compliant." *Id*.   In this case, there are no blood tests showing a non-therapeutic level and there is merely the a single admonition to plaintiff by his physician to be sure he was taking his medication. And, at the same time, his physician increased his anti-convulsant medication, further suggesting that noncompliance was not the real problem.  There is no "convincing evidence" of noncompliance in this record and thus, the ALJ's reasoning for finding that plaintiff did not meet the Listing is not supported by substantial evidence.

Further complicating the matter is the lack of any medical advisor on the issue of whether plaintiff met or equaled the epilepsy listing.  In this case, the Single Decisionmaker (SDM) model was used pursuant to 20 C.F.R.

46

§ 404.906(b)(2).  This regulation provides streamlined procedures as an experiment, in which State Agency disability examiners may decide cases without documenting medical opinions from State Agency medical consultants.  The "single decisionmaker model" was an experimental modification of the disability determination process that happens to have been used in Michigan.  *See Leverette v. Comm'r*, 2011 WL 4062380 (E.D. Mich. 2011).  This experiment eliminated the reconsideration level of review and allowed claims to go straight from initial denial to ALJ hearing.  *Id*.  Most significantly, it allowed the state agency employee (the single decisionmaker) to render the initial denial of benefits without documenting medical opinions from the state agency medical consultants.  *Id*., citing 20 C.F.R. §§ 404.906(b)(2), 416.1406(b)(2).  The Programs Operations Manual System (POMS) requires it to "be clear to the appeal-level adjudicator when the SSA-4734-BK [the PRFC assessment form] was completed by an SDM because SDM-completed forms are not opinion evidence at the appeal levels."  POMS DI § 24510.05.  Plaintiff's physical impairments were evaluated by an SDM, Beth Mol.  (Dkt. 7-3, Pg ID 94-111).  Thus, no medical opinion for plaintiff's physical impairments/epilepsy was obtained at this level of review, in accordance with this model.

While the ALJ did not rely on the opinion of the SDM, which would have been wholly improper, the lack of any medical opinion on the issue of equivalence

47

is still an error requiring remand.  As set forth in *Stratton v. Astrue*, 2012 WL 1852084, *11-12 (D. N.H. 2012), SSR 96-6p describes the process by which ALJs are to make step-three determinations:

> The administrative law judge ... is responsible for deciding the ultimate legal question whether a listing is met or equaled. As trier of the facts, an administrative law judge ... is not bound by a finding by a State agency medical or psychological consultant or other program physician or psychologist as to whether an individual's impairment(s) is equivalent in severity to any impairment in the Listing of Impairments. However, *longstanding policy requires that the judgment of a physician* (or psychologist) *designated by the Commissioner on the issue of equivalence on the evidence* before the administrative law judge ... *must be received into the record as expert opinion evidence and given appropriate weight.*

1996 WL 374180, at *3 (emphasis added); *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004) ("Whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue.") (citing 20 C.F.R. § 1526(b)); *Retka v. Comm'r of Soc. Sec.*, 1995 WL 697215, at *2 (6th Cir. 1995) ("Generally, the opinion of a medical expert is required before a determination of medical equivalence is made.") (citing 20 C.F.R. § 416.926(b)); *Modjewski v. Astrue*, 2011 WL 4841091, at *1 (E.D. Wis. 2011) (warning that an ALJ who makes a step-three equivalence determination without expert-opinion evidence runs the risk of impermissibly playing doctor).

The *Stratton* court further explains that SSR 96-6p treats equivalence determinations differently from determinations as to whether an impairment meets a listing, requiring expert evidence for the former, but not the latter. *Id.* at. *12; citing *Galloway v. Astrue*, 2008 WL 8053508, at *5 (S.D. Tex. 2008) ("The basic principle behind SSR 96-6p is that while an ALJ is capable of reviewing records to determine whether a claimant's ailments meet the Listings, expert assistance is crucial to an ALJ's determination of whether a claimant's ailments are equivalent to the Listings.") (citation and quotation marks omitted). This expert opinion requirement can be satisfied by a signature on the Disability Determination Transmittal Form. *Stratton*, at *12, citing SSR 96-6p, 1996 WL 374180, at *3 (The expert-opinion evidence required by SSR 96-6p can take many forms, including "[t]he signature of a State agency medical ... consultant on an SSA-831-U5 (Disability Determination and Transmittal Form)."); *Field v. Barnhart*, 2006 WL 549305, at *3 (D. Me. 2006) ("The Record contains a Disability Determination and Transmittal Form signed by Iver C. Nielson, M.D .... discharging the commissioner's basic duty to obtain medical-expert advice concerning the Listings question."). There is no Disability Determination and Transmittal Form signed by a medical advisor as to plaintiff's physical impairments in this record. (Dkt. 7-3, Pg ID 111).

49

The great weight of authority[2] holds that a record lacking any medical advisor opinion on equivalency requires a remand.  *Stratton*, at *13 (collecting cases); *see e.g. Caine v. Astrue*, 2010 WL 2102826, at *8 (W.D. Wash. 2010) (directing ALJ to obtain expert-opinion evidence on equivalence where none was in the record); *Wadsworth v. Astrue*, WL 2857326, at *7 (S.D. Ind. 2008) (holding that where record included no expert-opinion evidence on equivalence, "[t]he ALJ erred in not seeking the opinion of a medical advisor as to whether Mr. Wadsworth's impairments equaled a listing").  Nothing about the SDM model changes the ALJ's obligations in the equivalency analysis.  *See Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004) ("Whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue.") (citing 20 C.F.R. § 1526(b)); *Retka v. Comm'r of Soc. Sec.*, 1995 WL 697215, at *2 (6th Cir. 1995) ("Generally, the opinion of a medical expert is required before a determination of medical equivalence is made.") (citing 20 C.F.R. § 416.926(b)).  This analysis leaves intact the requirements imposed on an ALJ in making an equivalency determination, which do not otherwise appear to be modified by the SDM model.  *See also*, *Maynard v. Comm'r*, 2012 WL

---

[2] In *Stratton*, the court noted that a decision from Maine "stands alone" in determination that 20 C.F.R. § 404.906(b) "altered the longstanding policy that an ALJ is required to seek a medical opinion on the issue of equivalence." *Id.*, citing *Goupil v. Barnhart*, 2003 WL 22466164, at *2 n. 3 (D. Me. 2003).

5471150 (E.D. Mich. 2012) ("[O]nce a hearing is requested, SSR 96-6p is applicable, and requires a medical opinion on the issue of equivalence."); *Harris v. Comm'r*, 2013 WL 1192301, *8 (E.D. Mich. 2013) (A medical opinion on the issue of equivalence is required, regardless of whether the SDM model is implicated.). Thus, remand is also required to obtain a medical opinion on equivalence.  Moreover, it is well-established that "an ALJ may not substitute his [or her] own medical judgment for that of the treating physician where the opinion of the treating physician is supported by the medical evidence."  *Id.* (internal quotations omitted); *see also Bledsoe v. Comm'r of Social Sec.*, 2011 WL 549861, at *7 (S.D. Ohio 2011) ("An ALJ is not permitted to substitute her own medical judgment for that of a treating physician and may not make her own independent medical findings."); *Mason v. Comm'r of Soc. Sec.*, 2008 WL 1733181, at *13 (S.D. Ohio Apr. 14, 2008) ("The ALJ must not substitute his own judgment for a doctor's conclusion without relying on other medical evidence or authority in the record.").  In other words, "[w]hile an ALJ is free to resolve issues of credibility as to lay testimony, or to choose between properly submitted medical opinions, the ALJ cannot substitute his [or her] own lay 'medical' opinion for that of a treating or examining doctor."  *Beck v. Comm'r of Soc. Sec.*, 2011 WL 3584468, at *14 (S.D. Ohio June 9, 2011), *adopted by* 2011 WL 3566009 (S.D. Ohio Aug. 12, 2011).  Obtaining such an opinion will help the ALJ avoid such issues.

51

The undersigned recognizes that the final responsibility for deciding the RFC "is reserved to the Commissioner."  20 C.F.R. § 404.1527(d).  Nevertheless, courts have stressed the importance of medical opinions to support a claimant's RFC, and cautioned ALJs against relying on their own expertise in drawing RFC conclusions from raw medical data.  *See Isaacs v. Astrue*, 2009 WL 3672060, at *10 (S.D. Ohio 2009) ("The residual functional capacity opinions of treating physicians, consultative physicians, and medical experts who testify at hearings are crucial to determining a claimant's RFC because '[i]n making the residual functional capacity finding, the ALJ may not interpret raw medical data in functional terms.'"), quoting *Deskin v. Comm'r Soc. Sec.*, 605 F. Supp.2d 908, 912 (N.D. Ohio 2008); *see also Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) ("As a lay person, however, the ALJ was simply not qualified to interpret raw medical data in functional terms and no medical opinion supported the [RFC] determination."); *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985) ("By independently reviewing and interpreting the laboratory reports, the ALJ impermissibly substituted his own judgment for that of a physician; an ALJ is not free to set his own expertise against that of a physician who presents competent evidence.").

Although ultimately a finding of no disability may be appropriate in this case, substantial evidence does not exist on the record to support the current RFC

determination because there is no RFC determination by a consulting physician or expert medical advisor.  Thus, the ALJ's RFC determination (at least in part) was not based on any medical opinion but was apparently formulated based on his own independent medical findings.  Under these circumstances, the undersigned suggests that a remand is necessary to obtain a proper medical source opinion regarding plaintiff's epilepsy. Given the need for remand to obtain an expert medical opinion regarding plaintiff's epilepsy, plaintiff's credibility will necessarily have to be re-evaluated on remand.  The undersigned also concludes that the ALJ did not give sufficient good reasons for rejecting the treating physician's opinion regarding plaintiff meeting a Listing.  This too should be reassessed after the opinion of a medical advisor is obtained.

### 2.    Obesity and Intellectual Functioning

Obesity, by itself, does not constitute a disability and is not qualified as a "listed impairment."  SSR 02-1p, 2000 WL 628049, at *1.  "Social Security Ruling 02-01p does not mandate a particular mode of analysis.  It only states that obesity, in combination with other impairments, 'may' increase the severity of the other limitations."  *See Bledsoe v. Barnhart*, 165 Fed. Appx. 408, 411-12 (6th Cir. 2008).  Accordingly, the Sixth Circuit has held compliance with SSR 02-1p only requires demonstration that the ALJ "considered" obesity.  *See id*. ("It is a mischaracterization to suggest that Social Security Ruling 02-01p offers any

particular procedural mode of analysis for obese disability claimants."). Further, the administrative findings need not contain an explicit reference to the claimant's obesity if the decision as a whole appears to have adopted limitations resulting from the condition. *Coldiron v. Comm'r of Soc. Sec.*, 2010 WL 3199693, at *7 (6th Cir. 2010), citing *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). Here, as the Commissioner pointed out, the ALJ expressly considered plaintiff's weight in her decision. No treating physician offered any opinion that plaintiff's obesity caused any additional limitations and tellingly, plaintiff offers no evidence that his obesity caused any additional functional limitations beyond those found by the ALJ. Accordingly, plaintiff's claim of error should be denied. In addition, plaintiff's argument that the ALJ failed to consider that as his weight increased, his intellectual functioning decreased, is without merit. There does not appear to be any medical opinion evidence or other evidence to support this theory.

        3.      Concentration, Persistence, or Pace.

Plaintiff also argues that the ALJ erred by failing to account for his moderate difficulties in maintaining concentration, persistence, or pace (CPP) in both the RFC and the hypothetical questions to the vocational expert. Plaintiff argues that the RFC does not adequately account for the ALJ's finding that he had "moderate" difficulties in concentration, persistence, or pace. This court has determined that "there is no bright-line rule requiring remand whenever an ALJ's

hypothetical includes a limitation of 'unskilled, routine work' but excludes a

moderate limitation in concentration.  Rather, this Court must look at the record as

a whole and determine if substantial evidence supports the ALJ's RFC."  *Smith v.*

*Comm'r of Soc. Sec.*, No. 13-10862, 2013 WL 6094745, at *8 (E.D. Mich. Nov.

20, 2013), citing *Hess v. Comm'r of Soc. Sec.*, No. 07-13138, 2008 WL 2478325,

at *7 (E.D. Mich. June 16, 2008); *see also Lewicki v. Comm'r of Soc. Sec.*, No. 09-

11844, 2010 WL 3905375, at *3 (E.D. Mich. Sept. 30, 2010). In other words,

> Taken in isolation, the hypothetical limitations
> consisting of '[s]imple routine tasks in a low stress
> environment' and 'minimal changes in the work place
> setting' might appear inadequate to account for
> 'moderate' concentrational and pacing deficiencies.
> However, the record as a whole indicates that the
> hypothetical question and the ALJ's finding of
> "moderate" limitations findings are not incompatible.

*Hess*, 2008 WL 2478325, at *7; *see also Lewicki*, 2010 WL 3905375, at *3.  In

*Hess*, for example, even though the ALJ omitted a concentration-based limitation

from the hypothetical, this court did not remand because the entire record

supported a finding that plaintiff could perform unskilled work on a sustained

basis. *Hess*, 2008 WL 2478325, at *8.

The essential question here is whether the ALJ's conclusion that plaintiff

was limited to simply, routine tasks performed in a low stress work environments,

defined as simple work-related decisions, sufficiently accommodated the ALJ's

finding that plaintiff had moderate difficulties in concentration, persistence, or pace.  This issue has been addressed numerous times in this District, as noted in *Hicks v. Comm'r*, 2011 WL 6000714 (E.D. Mich. 2011), *adopted by* 2011 WL 6000701 (E.D. Mich. 2011) (Roberts, J.).  The undersigned agrees with the holding in *Hicks* that an RFC and hypothetical simply limiting a claimant to "simple routine tasks" may, in some instances, fail to capture a claimant's moderate limitation in concentration, persistence, or pace because the difficulty of a task is not equivalent to the difficulty of staying on task.  *Id.*, *citing Green v. Comm'r of Soc. Sec.*, 2009 WL 2365557, at *10 (E.D. Mich. 2009) ("It is difficult to reasonably accept 'moderate' meaning anything less than 20%–30% of the time at work. Thus, 'moderate' concentration problems . . . need to be included or accommodated in some suitable fashion in the hypothetical question at Step 5. . . . Simply including the hypothetical of unskilled jobs with limited contact with co-workers and the public is not sufficient."); *Edwards v. Barnhart*, 383 F. Supp. 2d 920, 930 (E.D. Mich. 2005) ("Plaintiff may be unable to meet quotas, stay alert, or work at a consistent pace, even at a simple, unskilled, routine job."). Yet, other cases seemingly conclude otherwise. *See e.g., Bohn-Morton v. Comm'r of Soc. Sec.*, 389 F.Supp.2d 804, 807 (E.D. Mich. 2005) (finding that "unskilled" work limitation in RFC was sufficient to account for ALJ's PRTF finding that claimant "often" experiences CPP issues); *Lewicki v. Comm'r of Soc. Sec.*, 2010 WL

56

3905375, at *3 (E.D. Mich. 2010) ("There may be cases where such moderate limitations preclude the performance of even some simple, unskilled tasks. Plaintiff does not, however, explain why the facts of this particular case require a more detailed hypothetical question to adequately account for his own moderate limitations in concentration, persistence, or pace.").

*Hicks* highlights an important reason the outcomes of these seemingly similar cases are often so different. The cases within this District that do not remand for the ALJ to include a moderate concentration, persistence, or pace limitation are distinguishable because a medical professional had made a specific finding that the claimant had moderate difficulties in concentration, persistence, or pace, but could still work on a sustained basis.  *Hicks*, 2011 WL 6000701, *4. Judge Michelson distinguished the cases where a medical professional found moderate difficulties in concentration, persistence, or pace, from cases like *Benton v. Comm'r of Soc. Sec.*, 511 F. Supp. 2d 842 (E.D. Mich. 2007) and the facts of *Hicks*, where the ALJ (rather than a medical professional) made the finding of moderate limitations in concentration, persistence, or pace.

Here, the ALJ made a finding of moderate limitations in concentration, persistence, or pace, supported by a medical opinion finding a moderate limitation in concentration, persistence, or pace, which indicated that the plaintiff was still capable of sustained simple tasks.  Thus, the RFC and hypothetical question in this

case were not flawed and properly accounted for plaintiff's moderate limitation in concentration, persistence, or pace, at least as this record stands now.  However, plaintiff's RFC in this regard may need to be reassessed, depending on the conclusions reached by the medical advisor regarding plaintiff's epilepsy.

## IV.   RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that plaintiff's motion for summary judgment be **GRANTED** in part and **DENIED** in part, that defendant's motion for summary judgment be **GRANTED** in part and **DENIED** in part, that the findings of the Commissioner be **AFFIRMED** in part and **REVERSED** in part, and that this matter be **REMANDED** for further proceedings under Sentence Four.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of*

*Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: August 24, 2015          s/Michael Hluchaniuk
                                   Michael Hluchaniuk
                                   United States Magistrate Judge

## CERTIFICATE OF SERVICE

I certify that on August 24, 2015, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to all counsel of record.

                                   s/Tammy Hallwood
                                   Case Manager
                                   (810) 341-7850
                                   tammy_hallwood@mied.uscourts.gov